Filed 7/8/22  In re Y.C. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Y.C, a Person Coming Under the Juvenile Court Law. | B312454 |
| | (Los Angeles County Super. Ct. Nos.19CCJP00983, 19CCJP00983D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| H.P., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Linda L. Sun, Judge.  Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Tarkian & Associates, Arezoo Pichvai, for Plaintiff and Respondent.

---

Father H.P. appeals from the juvenile court's order terminating his parental rights over his daughter, Y., following a hearing pursuant to Welfare and Institutions Code section 366.26.[1]  He argues that the trial court considered improper factors and failed to account for the strong bond he had with Y. in determining that the parental benefit exception did not apply.  We affirm.

## BACKGROUND

### I.  *Referral and Petition*

The family consists of mother, M.C., father, their child Y. (born 2013), and mother's three other children, A. (born 2004), S. (born 2005), and J. (born 2007).[2]  The family came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) on February 11, 2019, after A. told a school staff member that mother threatened to kill him and herself with a gun.  A. stated he was afraid for his siblings in the home. The school staff member called the police, expressing concerns about sending A. home.

A DCFS children's social worker (CSW) spoke with A. (then age 14) at the police station on February 11, 2019.  A. reported that he was fed "if mother has enough money," but that "sometimes there is no food." A. stated that father (A.'s stepfather) smoked marijuana in the home every day.  He also told the CSW that on one occasion, mother and father were arguing about "his money and his drugs," and that A. tried to break up the argument but was almost "hit with the gun in the face."  A. also stated that father had hit and injured J. and S.  When asked about mother and father fighting, A. recalled an incident where father hit mother, mother pushed father back, A.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]     Mother, children A., S., and J., and their father, H.T., are not parties to this appeal.  We include facts related to them only as relevant here.

2

stepped in and grabbed father, and father choked A. and threatened to beat him up. A. stated that father then grabbed mother's hair and started beating her up. Regarding the allegations, A. stated that after an argument with mother, he called maternal grandmother (MGM) and "told her I needed to stay with her." After mother learned he had done so, mother came into A.'s room with a gun, pointed it at him, and said she would kill him and herself. Mother told A. to "keep his mouth shut and tell grandma everything is ok." A. did as mother instructed. A. told police at the time that he was afraid to tell anyone about what happened because he believed that father would retaliate against him and physically harm him. A. also told the CSW that his younger siblings would not tell the CSW anything because they were terrified of mother and were coached.

The CSW interviewed siblings S. (then 13), J. (then 11), and Y. (then 5) the same day. The children stated that father did not live with them, but often visited and slept over. S. denied seeing anyone physically fighting or using drugs, and denied any physical discipline. When the CSW read the allegations, S. began to cry. S. told the CSW that she did not want "anything to happen to my mom," but "I don't want to be with her anymore." J. stated he had never seen mother and father fighting with their hands. When asked about the allegations, J. quickly responded, "that never happened." Y. denied physical abuse and said she was not afraid of anyone in the home. She also denied seeing any physical fighting between her parents. Y. denied seeing any argument between A. and mother or seeing mother with a gun. The CSW opined that Y. appeared to be coached.

Mother met with the CSW the same day and denied any substance abuse or physical discipline. She admitted a history of involvement with DCFS and disclosed that law enforcement raided her home on suspicion of guns but found none. Mother also admitted a history of domestic violence with father and with H.T., the father of A., S., and J. Regarding the allegations, mother stated that she and A. often argued but denied having a gun in the home. She claimed that A. started becoming rebellious and lying around age 8, after she and H.T. ended their relationship. Mother denied any fights between father and A., except one "scuffle" where they shoved each

other.  DCFS attempted to contact father on February 12  but was unable to reach him.

A CSW also spoke with MGM, who confirmed that A. called her a few days prior and said he was having issues at home.  MGM asked mother about it and mother denied any issues.  The following day, MGM received a call from A.'s school that he did not feel well.  When she arrived, A. stated he preferred to kill himself rather than returning to mother's house.  MGM took A. to her home and he told her that mother pointed a gun at her neck and threatened to kill herself if A. told MGM what was going on at home.  MGM stated that all the children witnessed the incident, but A.'s siblings would not speak about it because they are fearful and coached.  A. also reported to MGM that father had previously kicked him and hit  S.  MGM said she had seen mother with bruises on her arms and additionally told the CSW father had given mother a bloody nose about a year ago.

Father's criminal history included arrests in 2018 for possession of a firearm and in 2015 and 2018 for domestic violence, as well as multiple arrests related to possession and sale of controlled substances.  The family also had multiple prior referrals to DCFS, including in 2016, when law enforcement searched mother's home for marijuana, cash, guns, and gang information pursuant to a search warrant against father.  Father was not there at the time.  Mother denied having any guns and no guns or drugs were found.  Law enforcement indicated that there had been several prior calls for domestic violence between mother and father.  DCFS deemed the referral substantiated for general neglect and the family participated in a voluntary family maintenance case from March 2016 to March 2017.  The case was closed based on mother's cooperation with DCFS and her completion of parenting and domestic violence classes.  In 2018, DCFS investigated accusations of neglect after A. told his teacher that mother had kicked him out of the house.  A. later denied this occurrence and the referral was closed as inconclusive.  During the investigation, Y. stated that she had seen father hitting mother and that A. and S. had to intervene. The rest of the family denied any active domestic violence.

The court detained the children on February 11, 2019 and placed them with MGM.  DCFS filed a dependency petition on February 13, 2019 on

behalf of A., S., J., and Y. under section 300, subdivisions (a), (b)(1), and (j).[3] In counts a-1, b-1, and j-1, the petition alleged that mother "demonstrated aggressive and violent behavior" toward A. by pointing a gun at him and threatening to kill him in the presence of the other children. Counts a-2 and b-2 alleged that mother and father had a history of engaging in violent altercations. The petition alleged that on a prior occasion, father struck mother and pulled her hair in A.'s presence. Father then choked A. when he intervened in the altercation. On another occasion, a gun was brandished during a violent altercation between father and mother, also in A.'s presence. DCFS also alleged that father had a history of a criminal conviction for spousal abuse. In counts a-3, b-3, and j-2, the petition alleged that father abused J. by striking him in the face with a shoe, causing his nose to bleed, and that mother failed to protect the children from this abuse. Count b-4 alleged that father had a history of substance abuse, including daily abuse of marijuana, rendering him incapable of caring for Y. The petition also alleged that father was a registered "Controlled Substance Offender" with a history of criminal convictions for possession and sale of controlled substances. DCFS further alleged that mother knew of father's substance abuse and failed to protect the children by allowing them to reside with father.

Mother appeared at the detention hearing, but DCFS had not been able to locate father. The court found a prima facie case for jurisdiction over Y. under section 300. The court ordered Y. removed from both parents and ordered her continued placement with MGM. The court ordered monitored

---

[3] Section 300 states, in relevant part, "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶](a) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian. . . . [¶] (b)(1) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child. . . . [¶] (j) The child's sibling has been abused or neglected, as defined in subdivision (a), (b), . . . and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."

visitation for mother and father with Y, and ordered father not to have any contact with A., S., or J.

DCFS filed a first amended petition in March 2019. The amended petition added counts a-4, b-5, and j-3, alleging that on prior occasions father physically abused S. by striking her face, pulling her hair, and dragging her onto the floor.

## II.   *Jurisdiction/Disposition Report*

DCFS filed a jurisdiction/disposition report on March 8, 2019. DCFS was continuing its efforts to contact father, but mother denied having his contact information and stated that he did not currently reside with her. Mother told DCFS that she last spoke to father on February 16, when he called and asked to see Y. Mother told him about the DCFS case and father said he did not want to talk to mother anymore and expressed disinterest in dealing with DCFS or the court.

DCFS reported additional interviews with the children regarding the allegations of the petition. A. confirmed his prior statements regarding his argument with mother and mother's subsequent threats to shoot him and herself. A. told DCFS that mother told him to lie but "I'm not going to lie anymore." A. also reiterated an incident where father was "under the influence," accused mother of taking his money, and then beat her up. When A. intervened, father "grabbed me from my throat and told me to stay out of it." Father choked A. "to the point that I was going to pass out." A. then left the room with his siblings, who were "confused and scared." A. also repeated the allegation that father hit J. with a shoe and "made him bleed." A. reported that father had crystal methamphetamine, heroin, and other drugs, which he would sell, and that he smoked marijuana "non-stop" at times. A. told the CSW that father supervised the children while under the influence, stating that father "wouldn't really care about us. He would just send us to our room while he was smoking but the smoke still goes up there." Regarding the newest allegations, A. stated that he and father got into a fight after A. tried to leave. Father grabbed A. "from my shoulder aggressively," and "tried punching me a few times." Father then "dropped me on the floor, kicked me, messed up my leg." S. began crying and told father to stop fighting. Father followed S. into her room and demanded her phone. When

6

she resisted, he "grabbed her by the hair and dropped her on the floor. And he smacked her in the mouth."

In a reversal of her prior refusal to respond, S. confirmed that she saw mother with a loaded revolver and that mother threatened to shoot herself. S. stated that mother "used to tell us that if we told the police about this, about the drugs, the guns, we will be taken from our family and hit. She was lying." S. also stated that father threatened to kill mother during an argument, hit her, pulled her hair, put a gun to her head, and "whacked her with the gun in her eye." She confirmed that father choked A. and pulled S.'s hair. S. also stated that father sold and used drugs, "has guns on him," and was "violent." S. reported that father would strike her "a lot," and confirmed the recent fight between A. and father, followed by father taking S.'s phone so she could not contact MGM. S. stated that father pulled her hair "so hard that he pulled some out," dragged her onto the floor, and also hit her in the mouth.

J. also recalled the incident with the gun, stating that mother threatened to kill herself while holding father's gun. J. stated that he saw father hit mother and that father "smokes weed and it makes him mad." J. told DCFS that father grabbed S. by the hair "a lot" and that mother would not do anything because "she was scared that [father] was going to hit her." A., S., and J. all expressed fear or discomfort with mother and father resuming a relationship. A. stated that father was "the kind of person to threaten you and if he has a gun, he'll whip it out. If he's intoxicated, he'll just shoot it."

Mother spoke with a DCFS dependency investigator (DI) on February 28, 2019. The DI noted that mother "continuously digressed" and appeared to be "pre-occupied with establishing that the children are difficult, defiant and interested in gang activity." Mother claimed the last domestic violence incident with father was in 2016. MGM confirmed the allegations based on what the children had told her. She also reported that father smoked marijuana and that mother told the children to deny the allegations.

At the time of the report, father had "not made himself available to DCFS" and had not provided any statements. Father had not had any contact with Y. since the case began. DCFS submitted a last-minute

7

information for the court on March 15, 2019, indicating that its due diligence search for father "did not yield any contact information."

### III. *Adjudication and Disposition*

At the adjudication hearing on March 15, 2019, mother pled no contest to counts a-1 through a-4, alleging physical abuse of A., J., and S. by mother and father, and domestic violence between mother and father. She further stipulated to the children being declared dependents of the court under section 300 and to their removal from her custody, and agreed to the proposed case plan. The court found a factual basis for mother's plea and sustained counts a-1 through a-4 as to mother, dismissing the remaining counts. The children remained with MGM, with monitored visitation for mother. Accordingly, the court found jurisdiction over the children pursuant to section 300, subdivision (a). The court set the disposition hearing for May 16, 2019.

In April 2019, DCFS reported that S. and Y. disclosed that father made contact with the children at MGM's home on April 9, 2019. Y. opened the door when she saw father, and he greeted her and gave her a pair of shoes. S. ran to tell MGM, but by the time MGM got to the door, father was gone. DCFS reminded MGM to contact law enforcement if father appeared again. DCFS also detailed ongoing efforts to contact father but stated that father had failed to make himself available to DCFS.

Father appeared for the first time at the hearing on May 16, 2019. The court continued adjudication for the counts involving father and Y. and ordered DCFS to prepare an updated jurisdiction/disposition report.

In a last-minute information filed June 19, 2019. DCFS noted that mother and father "travelled to and appeared conjointly" at the May 16 hearing, but father had failed to contact DCFS since that time. Mother told DCFS that she and father were not together, but agreed to relay the message to father to contact the Department. DCFS also reported that mother was having regular monitored visits with Y. and J., but that A. and S. refused to have any contact with mother. Y. told the CSW that mother "told me to say I miss daddy. She wants me to say that but I don't care."

Father contacted DCFS on June 20, 2019. He stated that he decided to appear at the May 16 hearing to make it clear that the information reported

8

by the children was false. Father denied physically abusing the children and denied violent altercations with mother. Father acknowledged one past incidence of violence with mother which the children witnessed, resulting in the prior DCFS case, but stated "that was a long time ago." He reported that he was currently on a waiting list for a domestic violence program. Father stated that he and mother separated after their violent altercation, and he was currently homeless. Father acknowledged that he used marijuana to deal with stress but denied other drug use. Father told the CSW that he would abide by court orders to regain custody of Y. and expressed a desire to visit her.

On June 25, 2019, father pled no contest to counts a-1 through a-4 of the amended petition. He stipulated to jurisdiction over Y. and her removal from his custody. He also agreed to the case plan, including drug testing to show declining marijuana levels, domestic violence and parenting programs, counseling, and monitored visitation. The court accordingly sustained those counts as to father and dismissed the remaining counts. Turning to disposition, the court found by clear and convincing evidence that it was reasonable and necessary to remove Y. from both parents.

## IV. *Review Hearings*

DCFS filed a status review report on December 9, 2019 in advance of the six-month review hearing. The children continued to reside with MGM. Mother and father reported that they were living together. Mother stated that the house was condemned by the city and was infested with rats. Father stated that he was attending classes and visiting Y. weekly. According to DCFS, father was "appropriate during visits and Y[.] is happy to see her father." Y. was well-adjusted to living with maternal grandparents and appeared to have a strong bond with them. She also had a bond with her siblings. Maternal grandparents stated they were interested in adopting Y. if she did not reunify with her parents.

As of December 2, 2019, father had partially completed his domestic violence classes and counseling sessions, and finished all 10 parent education classes. Father had also agreed to submit to 10 random or on demand drug tests, showing decreasing marijuana levels. If any test was missed or dirty (apart from decreasing marijuana levels), father agreed to enroll in a full

drug rehabilitation program. Between June 21 and November 18, 2019, father had three no show tests and 20 tests positive for marijuana metabolites, with varying levels. The CSW encouraged father on October 31, 2019 to enter a full drug program because his marijuana levels were not declining, but father stated that he would wait for his court date.

DCFS reported that father consistently visited Y. once a week for four hours. According to the monitor, Y. was happy to see father, who brought food for her and would often buy her clothing and toys. Y. would sit on father's lap while playing on his phone or on a tablet. Y. told DCFS that she wanted to go home when her parents stopped fighting.

During an interview in November 2019, Y. told a CSW that she missed father but did not want to go home. The following month, when asked whether she wanted to go home with mother and father, Y. stated, "not yet, just visit them." Y. also said she liked living with maternal grandparents.

DCFS concluded that it would be detrimental to Y. to return to her parents because neither mother nor father showed insight on the issues that led to DCFS involvement. Mother and father continued to have a relationship and mother had not expressed how she would protect the children. Father had not completed a full drug program and had not made himself available to DCFS to discuss his progress. Additionally, mother and father lacked stable, safe housing.

At the six-month review hearing on December 26, 2019, the court found that continued jurisdiction was necessary and return of Y. to her parents would create a substantial risk of detriment. The court ordered continued family reunification services for both parents and set a 12-month review hearing for April 2020. That hearing was subsequently continued due to the COVID-19 pandemic.

In an April 2020 status review report, mother reported that she was separated from father. Father stated he was homeless and staying with paternal grandmother. DCFS reported that Y. was a "playful, happy, talkative child", who had "acclimated to the structure and routine at maternal grandmother's home" and maintained a strong bond with her siblings. Y. also had a strong bond with maternal grandparents, who were providing Y. and her siblings with a stable and safe home environment.

Father had completed domestic violence and parenting classes, as well as his individual counseling. Father continued to test positive for marijuana between November 2019 and March 2020 at varying levels. Father continued his weekly visits with Y., with DCFS reporting that he was attentive to her needs. DCFS cautioned father that he should limit the use of his cell phone and instead "interact with [Y.] with the use of books, dolls or crayons." Father told DCFS that his goal was to regain custody of Y. and he really wanted to be in Y.'s life. Y. stated that she loved mother and father. DCFS's notes from father's weekly visits indicated that Y. hugged and kissed father at the beginning and end of each visit and appeared happy to see him. The visits took place at a McDonald's restaurant, where Y. would eat, play, and talk to father. Often father would buy Y. clothing and toys at a nearby store. At the end of the visits, father and Y. said "I love you" to each other. At a visit on March 14, 2020, Y. became upset when father would not let her use his phone. Father told her to "stop acting up, if you don't listen . . . they're going to take you away."

In a March 2020 interview, Y. told the CSW that she felt safe with MGM. She also said she liked to see father on weekends, father would buy her food and sometimes they played. Y. told the CSW she wanted to go back to living with mother and father, but also to be with MGM some days. A., S., and J. all stated they were not interested in visiting or reunifying with mother and wanted to remain with MGM.

Father told DCFS in March 2020 that his full alcohol and drug program was closed until further notice due to the pandemic. Father told the CSW he planned to keep contact with mother so that they could parent Y., and he would "keep it cool."

DCFS opined there was a continuing detriment to returning Y. home to father because father's marijuana levels had increased and he had not completed a full drug program. In addition, DCFS did not have sufficient information to "attest father has learned insight as to how to be sober." DCFS also noted that father's housing situation remained unstable. Maternal grandparents were interested in adopting Y. and her siblings. DCFS recommended the court provide six more months of services for parents.

DCFS filed a status review report on August 19, 2020. In assessing the current family circumstances, DCFS reported that father had expressed his desire to do anything required to reunify with Y., but he "does not have a stable place to live, is not employed, and [has] not complied with all of the Court requirements." DCFS stated that father had consistently visited Y., but he "lacks the ability to set boundaries" with Y. and had a difficult time telling the child "no." Father had started to assist Y. with math and reading during visits. DCFS noted that father struggled at times with disciplining Y., although he had made some progress.

DCFS reported that Y. was "outgoing, smart and respectful," was well bonded to maternal grandparents, and called MGM "mom." DCFS observed that Y. was well-adjusted to the home with her maternal grandparents and had a bond with her siblings. Y. expressed feeling safe at home with MGM. Y. also liked father and stated that she missed mother. Y. stated that she wanted to return home with mother and would like to see her more often. Y.'s therapist reported that she was receiving individual counseling and conjoint counseling with MGM, and that Y. met her progress goals. The therapist told the CSW that she was concerned with Y. reunifying with father "due to gang affiliation."

During this period, MGM told DCFS that father brought snacks for Y. "late or when she demands it." The CSW reminded MGM that father was not supposed to come close to the home, but could meet Y. in a nearby parking lot. MGM also reported that father "hangs out late with his friends, drinks alcohol and is inhaling helium from balloons." She was afraid if father found out she disclosed this information, that he and his friends would retaliate against her. Y. told the CSW that she would rather go home with mother than father. Y. also reported that she went to the park alone with father.

A DCFS team met with MGM and the children, and MGM expressed concern that father "visits Y[.] whenever he wants and it is having a negative impact on Y[.]'s behavior," noting that father "gives Y[.] everything she wants any time during the day." MGM stated she was concerned father would hurt the children, and that father told mother if she did not continue their relationship, he would hurt A. The team decided to set up two monitored phone calls and two monitored in-person visits per week between father and

12

Y.  The team also met with father, who stated he had been using less marijuana, but still used it when he was stressed.  Father expressed a desire for unmonitored visits and became emotional when talking about reunifying with Y.  The team explained that father needed to enter the full drug and alcohol program.

Father's monitored in-person and video visits proceeded in August 2020 without incident, with father at times helping Y. with schoolwork. Y. expressed happiness with having visits with father.

DCFS reported father's drug test results from March to August, 2020, including eight tests between March and June positive for marijuana, but with generally decreasing levels, and 14 negative tests between April and August.  Father's levels triggered a full drug program, and father reported that he had enrolled, but the facility was closed due to the pandemic.  On July 31, a staff member at the facility told the CSW that father "ain't here no more," and had not logged into a virtual class since the pandemic began in March.  The CSW provided father with alternative referrals for a drug program on August 5, 2020.  On August 12, 2020, father told the CSW that he had enrolled in a drug and alcohol program, but had not yet started it. Father continued to live with paternal grandmother but did not currently have a job or a permanent place to live.

DCFS opined that it would be detrimental to return Y. to father's custody because father had only recently enrolled in a drug program and had not completed it, despite having ample time to do so.  Further, father's housing situation remained unstable, as he was temporarily living with paternal grandmother.  DCFS remained concerned about unmonitored contact between Y. and father as it did not have enough information regarding father's progress in his drug program.  DCFS opined that the risk to Y. from mother and father remained high, and therefore recommended terminating family reunification services for both parents.

At the review hearing in September 2020, the court found that continued jurisdiction was necessary and that returning Y. to her parents' custody would create a substantial risk of detriment.  The court found that mother had made substantial progress in her case plan and father had made partial progress, and ordered continued reunification services for both

13

parents. The court noted that if Y. could not be returned to her parents by the next court date, it could result in termination of services pursuant to section 366.26.

## V. *Termination*

In its status review report in November 2020, DCFS reported that father had obtained employment but did not have stable housing and had not complied with all the court's requirements. Father tested negative for marijuana eight times between August and October 2020, and positive once on October 5. Father stated that the positive result occurred after he smoked with some friends. Father had enrolled in but not yet completed the full drug and alcohol program. His counselor reported he had shown improvements. Father participated in random testing through the program, testing positive for oxymorphone and cotinine on August 10 and for cotinine on September 4. Father explained these results by stating that he was having tooth pain and his friend had given him a pill. Father also enrolled in individual psychotherapy and had completed six sessions. His therapist opined that father was motivated to provide a safe and stable home for himself and Y. if given proper services.

DCFS reported that father was consistently attending in-person and video visits with Y. Father "has shown he cares about Y[.] by always making sure she is fed," and bringing her food. Father and Y. often played together during visits and father cautioned Y. to "slow down" when she ran on the playground. Father "attempted a few times" to work with Y. on schoolwork, but it was not consistent as Y. would change the subject or say she did not want to do the work. Father and Y. said "I love you" to each other at the end of every visit. The video visits between Y. and father did not proceed as smoothly. Y. often ignored father, instead playing with a phone or iPad.

On September 10, the CSW cancelled a visit due to safety concerns, after a car approached outside of father's home, where Y. and father were visiting, and the male driver yelled father's nickname, pulled out a stack of money, and yelled "I'm on you." The car left but returned a few minutes later. The CSW observed the driver stare at father and Y. before driving away. The CSW cancelled the visit. Father stated that the driver was a

14

friend who had money to repay father from a car accident. The CSW noted she had observed father's nickname spray painted outside the home.

In September 2020, mother told DCFS that she saw father on the street and he threatened her. Mother had not gotten a restraining order against father but said she would do so. MGM told DCFS that she was considering moving because of concerns with A. running into father outside their apartment and father provoking confrontation with A. A. stated that he saw father outside, father and his friends stared at A., and A. was concerned for his safety.

DCFS received a report of a domestic violence incident in the home where father was living on October 4, 2020, involving law enforcement. Father stated he was unaware of the incident. The CSW observed father's older brother outside the home under the influence and drinking alcohol. DCFS concluded that returning Y. to father would be detrimental, as father had not completed his drug program and had returned inconsistent drug test results, failing to demonstrate the ability to maintain sobriety. DCFS noted that father had tested positive for marijuana and oxymorphone while attending drug counseling and therapy sessions. DCFS further noted safety concerns with Y. having unmonitored contact with father, citing the incident outside of father's home and his unsafe living situation. DCFS recommended terminating reunification services.

On November 2, 2020, Y. asked the CSW whether she would still have visits with father if she returned home to mother. Y. also said that she would like to live with mother, maternal aunt, and her cousin. She indicated she understood that would mean she would not live with her siblings, who were getting adopted, but said that she would visit them.

The court held the next review hearing on December 1, 2020. Counsel for Y. noted that both parents had been in at least partial compliance with their case plan and that Y. had expressed an interest in living with mother. But she joined in DCFS's request to terminate reunification services, citing mother's statement that father had threatened her and father's positive drug tests. Father's counsel argued that he had done "everything that the department has asked" and noted that DCFS never asked father about the threats alleged by mother. He requested unmonitored visitation with Y. and

continued services. The court found continued jurisdiction was necessary under section 300 and that return of Y. to her parents' custody would create a substantial risk of detriment. The court also found that mother and father had made partial progress in their case plans. The court noted that neither parent had their visits liberalized to unmonitored contact and found that the "quantity" of father's contact with Y. was "fair" but the "quality" of that contact was "very poor." The court further noted the safety issues related to father's visitation. The court terminated reunification services for both parents and set a permanency planning hearing.

DCFS filed a section 366.26 report, stating that Y. had a strong bond with maternal grandparents and with her siblings, and that maternal grandparents continued to ensure that Y.'s needs were met. Maternal grandparents were "highly motivated" to move forward with adopting Y. and providing her with a permanent and stable home.[4] Y. told the adoption CSW that she liked maternal grandparents very much, they were good to her and loved her. DCFS reported that Y. was happy and comfortable with maternal grandparents, and was thriving in their care. DCFS recommended that the court terminate the parental rights of mother and father and proceed with the adoption process for Y.

At father's request, the permanency planning hearing was continued from March 30, 2021 to May 17, 2021 for a contested hearing. The court ordered DCFS to file a last-minute information with updated information on the quality and quantity of the parents' visits. On April 7, 2021, DCFS reported that, per maternal grandfather, who acted as the monitor, father had consistent weekly visits with Y. where they would play on the playground, father brought food for Y, and at the end, father gave Y. a kiss. DCFS reported that father tested positive for alcohol on December 4, 2020 and had not tested with DCFS since that date. Father also had not tested through his drug program since December 19, 2020; he agreed to test in January and February 2021 but did not do so. Father completed his drug and alcohol treatment program in February 2021. DCFS also reported that

---

[4]     Maternal grandparents were also proceeding with the adoption of Y.'s siblings, A., S., and J. The court terminated parental rights to those children in January 2021.

MGM stated she was open to maintaining visits between Y. and her parents post adoption. Mother agreed with the permanent plan for Y.

In the May 4, 2021 status review report, Y. told DCFS that she wanted to live with mother and her cousins, but also with her siblings. DCFS observed that Y. appeared to be healthy and thriving in her placement, calling maternal grandparents "mom" and "papa" and improving her academic grades. Maternal grandparents ensured Y.'s needs were met, including assisting with her academics, taking her to her medical and therapy appointments, and taking the lead in monitoring Y.'s visits with her parents. DCFS therefore recommended Y. continued to be placed with maternal grandparents, with the goal of adoption.

The court held the permanency planning hearing on May 17, 2021. Father testified that he was currently visiting with Y. once per week for four hours. From March to December 2020, he had only video visits due to the pandemic. He described his in-person visits as mostly playing with Y. and "here and there" he would try to work on schoolwork with Y. He said that Y. would tell him she missed him and mother. He testified that he and Y. loved each other and he felt like they had a close relationship. He also brought Y. breakfast every visit, and bought her anything else she needed, such as clothing, toys, and food.

Counsel for Y. agreed with DCFS's recommendation to terminate parental rights. She commended father for his regular visitation, but argued that "a mere showing that there's some benefit to the parent-child relationship is insufficient to meet the parental exception to adoption." She argued that Y. had been placed with maternal grandparents for more than two of her seven years, and that her siblings were moving forward with adoption. As such, she asserted that it was in Y.'s best interest to move forward with the adoption. Mother also submitted to DCFS's recommendation.

Father's counsel asked the court to find that the parental benefit exception applied, arguing that father had maintained regular visitation throughout the case and had been "very engaged with his child." He argued that it was "very clear that this is more than just some incidental benefit for Y[.] for this relationship to continue," because father stood in a parental role

with Y. and "is not a mere playmate for her." He argued that father and Y. were strongly bonded, that father did homework with Y., regularly provided her with necessities, and provided her with advice and guidance. He also noted that the pandemic had restricted father's visits and cautioned the court to "conduct its analysis within the context of the visitation that father had been allowed." Counsel for DCFS acknowledged that father had a good, affectionate relationship with Y., but argued that "something far more significant" was required. He contended father failed to show that his bond with Y. was so significant that severing it would be a detriment to Y. He argued that Y. had "moved on significantly in her life," and that MGM now was "her primary bond."

The court found that continued jurisdiction was necessary and by clear and convincing evidence that Y. was adoptable. The court found that although father "has maintained regular visitation with the child and the child has established a friendly bond, a loving bond with the father . . . any benefit accruing to the child from her relationship with the father is outweighed by the physical and emotional benefit the child will receive through the permanency and stability of adoption, and that adoption is in [the] best interest of the child." The court noted that "while the interaction between the father and Y[.] will always confer some incidental benefit, that loving and frequent relationship is not enough to overcome the need for Y[.]'s stability." The court reasoned that Y. had been placed with MGM for over two years and father had "not shown that he has occupied a meaningful parental role." The court acknowledged father's testimony that he had fed Y., bought things for her, and discussed homework, but found "there is evidence that helping the child with homework was not consistently done at every visit and that the father was not able to engage or help the minor with her homework at every visit. The child seemed to be preoccupied with other things. . . . The visits with the father and the child appeared to be very friendly, but they appear to be more of play dates than being in a parental role for the father."

Accordingly, the court found there was no compelling reason to determine that termination of parental rights would be detrimental, as Y. had been with maternal grandparents for more than two years, was with her

siblings, and maternal grandparents had provided daily care and consistently met Y.'s "educational, developmental, medical, and emotional needs," thus their bond was "much stronger." The court also found "no evidence of significant emotional attachment between the minor and the father, although she says she misses [her parents]. But that mere resuscitation of her affection for the mother and father does not overcome the strong bond that she has with her maternal grandparents. It is in the child's best interest to maintain her stability and permanency. It would be detrimental to the child to be returned home to the mother and father."

Having found that no exception to adoption applied, the court terminated mother's and father's parental rights. The court designated maternal grandparents as the prospective adoptive parents.

Father timely appealed.

## DISCUSSION

Father contends the court erred in finding that the parental benefit exception to adoption did not apply and terminating his parental rights pursuant to section 366.36. We find the court did not abuse its discretion in concluding that father had not established the necessary exception. We therefore affirm.

## I. *Legal Principles*

### A. *Parental benefit exception*

Section 366.26's express purpose is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) If the juvenile court has decided to end reunification services, adoption is the legislative preference. (§ 366.26, subd. (b)(1); see also *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.]"].) Thus, once the juvenile court finds the child is adoptable, "the court must order adoption and its necessary consequence, termination of parental rights," unless a parent can demonstrate one of the exceptions set forth in section 366.26 applies. (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53; see also § 366.26, subd. (c)(1); *In re Caden C.* (2021) 11 Cal.5th 614, 625 (*Caden C.*).)

The specified circumstances in section 366.26, subdivision (c)(1)(B) are "actually, *exceptions* to the general rule that the court must choose adoption where possible." (*In re Celine R., supra*, 31 Cal.4th at p. 53.) They "'must be considered in view of the legislative preference for adoption where reunification efforts have failed.' [Citation.] At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.' [Citation.] The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*Ibid*.; see also *In re A.L.* (2022) 73 Cal.App.5th 1131, 1150.)

The exception at issue here is the parental benefit exception, which permits the selection of another permanent plan if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) In *Caden C., supra*, 11 Cal.5th 614, our Supreme Court "discern[ed] three elements the parent must prove" to establish the parental benefit exception under section 366.26, subdivision (c)(1)(B)(i). (*Id*. at p. 631.)

First, the parent asserting the exception must show "regular visitation and contact with the child, taking into account the extent of visitation permitted." (*Caden C., supra*, 11 Cal.5th at p. 636.) This element is "straightforward," assessing whether the parent visits consistently. (*Id*. at p. 632.)

Second, the parent must show that "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra*, 11 Cal.5th at p. 636.) In assessing whether the child would benefit from continuing their relationship with the parent, "the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.]" (*Id*. at p. 632.) Thus, "courts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.]" (*Ibid*.)

20

For the third element, the parent must show that terminating the parent-child attachment "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life. [Citations.]" (*Id*. at p. 633.) This evaluation consists of a "subtle, case-specific inquiry[,]" including consideration of whether "the benefit of placement in a new, adoptive home" outweighs the harm the child "would experience from the loss of [a] significant, positive, emotional relationship" with the parent. (*Ibid*.) In making this detriment determination, the juvenile court does "not look to whether the parent can provide a home for the child," and "is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Id*. at p. 634.)

### B. *Standard of review*

In *Caden C., supra*, 11 Cal.5th 614, our Supreme Court clarified the standard of review applicable to a juvenile court's findings regarding the parental-benefit exception. The first two elements—regular visitation and a beneficial relationship—involve determinations that are essentially factual; we therefore review those findings for substantial evidence. (*Id*. at p. 640.) The third element requires the juvenile court to determine whether any harm the child would suffer from severance of the parental bond would outweigh the benefit to the child of adoption. (*Ibid*.) This requires a "hybrid" standard of review. (*Id*. at pp. 640-641.) Like the first two elements, the juvenile court must make a series of factual determinations including determinations about the child's relationship with the parent, which we review for substantial evidence. (*Id*. at p. 640.) However, "the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his [or her] parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid*.)

We also note that, unlike in *Caden C.*, the juvenile court here found that father did not meet his burden of proving the exception. In such a case, where the trier of fact has "expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case [citations]." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, overruled on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989.) Thus, to the extent father challenges the juvenile court's findings regarding his failure of proof, we determine whether the evidence compels a finding in his favor as a matter of law, asking whether that evidence was uncontradicted and unimpeached and of such a character and weight as to leave no room for a judicial determination it was insufficient to support a finding. (*In re I.W., supra*, 180 Cal.App.4th at p. 1528.)

## II.    *Analysis*

### A.    *No reliance on an impermissible factor*

Father first contends that the juvenile court "inserted an impermissible factor" into its analysis of the parental benefit exception. He cites the court's statement that "[i]t would be detrimental to the child to be returned home to mother and father." Father argues that this statement demonstrates that the court improperly assessed his current ability to provide a home for Y. and relied on his continued struggles (such as with sobriety) as a basis to reject application of the parental benefit exception. We find no error in the court's analysis.

In *Caden C.*, the high court explained: "A parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception. . . . [W]hen the court sets a section 366.26 hearing, it terminates reunification services for the parent. [Citation.] Thus, when the court holds a section 366.26 hearing, it all but presupposes that the parent has not been successful in maintaining the reunification plan meant to address the problems leading to dependency. [Citation.]" (*Caden C., supra*,

22

11 Cal.5th at p. 637.) Thus, "the parent's struggles with issues such as those that led to dependency are relevant only to the extent they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it? The parent's continuing difficulty with mental health or substance abuse may not be used as a basis for determining the fate of the parental relationship by assigning blame, making moral judgments about the fitness of the parent, or rewarding or punishing a parent." (*Id.* at p. 638.)

We find no basis in the record to support father's contention that the juvenile court impermissibly relied on his current fitness for custody as a factor in its analysis of the parental-benefit exception.[5] Apart from the single remark father cites, the court did not make any reference to or findings regarding any of the issues that led to the dependency, such as father's substance use, physical abuse of his step-children, and history of domestic violence with mother, nor did the court base its findings on the ongoing concerns raised by DCFS regarding the stability and safety of his living situation. Instead, the record reveals that the court properly discussed and assessed the bond Y. had with father and whether that bond outweighed the benefits of Y.'s adoption by maternal grandparents. Based on this context, we conclude that the record does not indicate the juvenile court considered any improper factors in declining to apply the parental benefit exception.

### B. *Case-specific inquiry*

Father also argues that the juvenile court erred by failing to conduct the case-specific weighing required under *Caden C.* We disagree.

It is undisputed that father met the first element under *Caden C.*, consistent visitation with Y. The trial court found as much and we agree that substantial evidence supports that finding.

Respondent DCFS also states that the trial court's finding that Y. had a "friendly" and "loving bond with father" could arguably establish the second element. We do not necessarily agree with respondent that father met his

---

[5] We note that the juvenile court did not have the benefit of the analysis in *Caden C.*, which was issued a few weeks after the permanency planning hearing here. Nevertheless, we find the juvenile court's analysis was consistent with the holdings in *Caden C.*

23

burden to establish this element, particularly in light of the amount of time Y. spent outside father's custody and the court's finding that his interactions with Y. were more akin to playdates than visits demonstrating that Y. had a "substantial, positive" attachment to father. (*Caden C., supra*, 11 Cal.5th at p. 632.) However, we will accept respondent's concession and turn to the third element.

The dispute here thus turns on whether father established the third element of the parental benefit exception. We conclude the court did not abuse its discretion by finding the benefits Y. would gain through adoption by maternal grandparents would outweigh any harm she would suffer due to termination of her relationship with father.

As the juvenile court observed, Y. had been placed with maternal grandparents, along with her siblings, for over two years at the time of the permanency planning hearing. Throughout that time, maternal grandparents expressed interest in providing a permanent home for all four children if they failed to reunify with their parents. It is undisputed that maternal grandparents consistently provided a safe, stable, and nurturing environment for Y., and ensured her needs were met. The record reflects that Y. had a close, loving bond with maternal grandparents, calling them "mom" and "papa," as well as a strong bond with her siblings, who were also being adopted into the same household. Based on this evidence, the juvenile court reasonably could find Y. would derive substantial benefits from placement in an adoptive home with maternal grandparents and her siblings.

Moreover, the trial court found that father had failed to establish that his relationship with Y. was so significant that its termination would result in detriment outweighing those benefits. The court found that the relationship between Y. and father, while mostly positive and loving, was closer to that of playmates than a significant bond between a parent and child. Father contends in making this finding, the court erroneously inserted a requirement that he occupy a "parental" role with Y. He argues that under *Caden C., supra*, 11 Cal.5th at p. 278, the court cannot require a parent to show that he or she occupies a parental role in the child's life. We disagree with father's contention that the court required such a showing here. Instead, the court properly considered "the strength and quality of the parent's

relationship with the child, including whether that parent has a parental role," as relevant to its determination that the benefits of adoption outweighed any detriment from severance of the parental relationship. (*In re A.L., supra,* 73 Cal.App.5th at p. 1157.)

We also note that, in contrast to *Caden C.*, the record does not contain any evidence suggesting Y. had difficulty separating from father at the end of visits or that Y. had such an "intense" bond with father that severing the relationship would lead to trauma such as emotional instability, acting out, difficulties in school, insomnia, anxiety, or depression. (*Caden C., supra,* 11 Cal.5th at p. 628 [relying on expert testimony].) Indeed, Y.'s counsel agreed with the Department's recommendation to terminate parental rights.

We reject father's contention that the court failed to "engage in a subtle [and] detailed analysis of the nature of the relationship" between Y. and father, as required by *Caden C.* Father argues that the court could not conduct this analysis because DCFS "provided very little information . . . about the quality *of Y[.]'s feeling* for Father and the emotional impact it would be on [*sic*] the child to sever[ ] that relationship." As a result, father contends the court impermissibly made "assumptions about how the child felt" based on father's actions.

The record does not support this contention. DCFS's reports included detailed notes on over 18 months of visits between Y. and father, including descriptions of father's interactions with Y. during those visits. In addition, DCFS detailed numerous interviews with Y. and her therapist regarding Y.'s feelings about father and the nature of their relationship. As such, father's reliance on *In re J.D.* (2021) 70 Cal.App.5th 833 (*J.D.*) is inapposite. Father quotes dicta from *J.D.*, in which the court observed: "[I]n evaluating the record, we cannot overlook the fact the agency provided very little information in its prior reports ... about the quality of [the] mother's relationship with [her son] or even the nature of her interactions with him during visitation. That was not appropriate and did a disservice not just to [the] mother and [her son] but also the juvenile court." (*Id.* at p. 860.) However, unlike the reports in *J.D.*, the DCFS reports here "provided objective, disinterested information about the quality of [Y.'s] attachment to . . . [father.]" (*Id.* at p. 861.) The court was entitled to rely on this evidence,

25

along with father's testimony and the remainder of the record, to assess the nature of Y.'s relationship with father.[6]

Similarly, father's contention that DCFS committed a "shocking misstep" by failing to provide a bonding study is meritless. In assessing the applicability of the parental benefit exception, any party may request a bonding study, and the court has discretion to order one "to illuminate the intricacies of the parent-child bond so that the question of detriment to the child may be fully explored." (*In re S.R.* (2009) 173 Cal.App.4th 864, 869; see also *Caden C., supra*, 11 Cal.5th at p. 633, fn. 4 ["Trial courts should seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony."].) Father did not request a bonding study here and has not shown that the juvenile court's failure to order one sua sponte was an abuse of its discretion.

On this record, we cannot conclude that the juvenile court abused its discretion by finding the benefits of placing Y. in an adoptive home with maternal grandparents and her siblings outweighed any detriment she would suffer due to the loss of her relationship with father. Thus, the juvenile court did not err in concluding father failed to satisfy the third element of the parental benefit exception.

### DISPOSITION

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

---

[6] To the extent father contends the juvenile court was required to make specific findings in declining to apply the parental benefit exception, he forfeited that argument by failing to object below. (See *In re E.A.* (2012) 209 Cal.App.4th 787, 790–791.) Moreover, the court was not required to explain its reasons for refusing to apply the exception. (*In re A.L., supra,* 73 Cal.App.5th at p.1156.)

We concur:

WILLHITE, ACTING P.J.

CURREY, J.